## No. 25-4864

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OSNY SORTO-VASQUEZ KIDD; INLAND COALITION FOR IMMIGRANT JUSTICE; COALITION FOR HUMAN IMMIGRANT RIGHTS,

*Plaintiffs-Appellees,*

v.

KRISTI NOEM, Secretary,
U.S. Department of Homeland Security (DHS), et al.,

*Defendants-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-03512-ODW-JPR (Wright, II, J.)

## DEFENDANTS'-APPELLANT'S OPENING BRIEF

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

ANDREW C. MACLACHLAN
Senior Litigation Counsel

STEPHANIE L. GROFF
Trial Attorney
Office of Immigration Litigation
Civil Division
P.O. Box 878, Ben Franklin Station
U.S. Department of Justice
Washington, DC 20044
Tel: (202) 305-5438

*Attorneys for Defendants-Appellants*

BRIAN DONOHUE
Law Clerk

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION ................................................... 2

STATEMENT OF THE ISSUES......................................................... 3

STATEMENT OF THE CASE ............................................................ 3

    I.    Statutory and Regulatory Framework ...................................... 3

    II.    Relevant Factual Background and Procedural History ............. 6

        A.    The Amended Complaint and Class Certification ............ 6

        B.    Parties' Motions for Summary Judgment and the District Court's May 15, 2024 Order ............................... 8

SUMMARY OF THE ARGUMENT ..................................................13

STANDARD OF REVIEW ................................................................15

ARGUMENT.....................................................................................15

    I.    Both Organizational Plaintiffs and the Speculative Class of Unnamed Individuals Lack Article III Standing .......................15

        A.    Plaintiffs Have Failed to Demonstrate Organizational Standing..................................................17

        B.    Plaintiffs Have Failed to Demonstrate Associational Standing Because Declaratory Relief Requires a Showing of Real and Immediate Future Harm .............. 25

    II.    The District Court's Summary Judgment Order Should Be Reversed Based on the Court's Erroneous Fourth Amendment Analysis ............................................................. 36

        A.    The District Court Misapplied *Lundin* and Improperly Restricted ICE's Lawful Use of an Implied License to Execute Knock-and-Talks................ 37

i

B.    Civil Immigration Enforcement Requires Distinct Analysis Under the Fourth Amendment .........................44

III.    The District Court's APA Ruling Is Incorrect, as the Court Erred by Interpreting the Regulation in Isolation....................50

CONCLUSION .......................................................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Abel* v. *United States*,
362 U.S. 217 (1960)........................................................................3, passim

*Alderman v. United States*,
394 U.S. 165 (1969).................................................................. 34

*Allen v. Wright*,
468 U.S. 737 (1984) ................................................................. 33

*Am. Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021)................................................. 29

*Arizona All. for Retired Americans v. Mayes*,
130 F.4th 1177 (9th Cir. 2025) ............................................... 20

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989)................................................................. 32

*Birchfield v. North Dakota*,
579 U.S. 438 (2016) ................................................................. 37

*Bivens v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388 (1971) ................................................................. 7

*Black Lives Matter L.A. v. Cityof Los Angeles*,
113 F.4th 1249 (9th Cir. 2024)................................................ 35

*Carlson v. Landon*,
342 U.S. 524 (1952) ................................................................. 45

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ................................................... 49

*City of Los Angeles v. Cnty. of Kern*,
581 F.3d 841 (9th Cir. 2009) ...................................................16

*City of Los Angeles* v. *Lyons*,
  461 U.S. 95 (1983).............................................................. 17, passim

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)........................................................ 17, 24, 25, 31

*Ctr. for Biological Diversity v. Exp.-Import Bank of the United States*,
  894 F.3d 1005 (9th Cir. 2018) .............................................................16

*DaimlerChrysler v. Cuno*,
  547 U.S. 332 (2006)...............................................................15

*Far Out Productions, Inc. v. Oskar*,
  247 F.3d 986 (9th Cir. 2001) ..............................................................15

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .............................................................. 17, passim

*Florida v. Jardines*,
  569 U.S. 1 (2013)............................................................37, passim

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000)...............................................................15

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022)...............................................................12

*Golden v. Zwickler*,
  394 U.S. 103 (1969) ................................................................ 28

*Gonzalez v. ICE*,
  975 F.3d 788 (9th Cir. 2020)............................................................... 49

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................ 17, passim

*Healy v. Milliman, Inc.*,
  164 F.4th 701 (9th Cir. 2026) .........................................................15, 26

*Hernandez v. Campbell,*
204 F.3d 861 (9th Cir. 2000) ...................................................................16

*Hunt v. Wash. St. Apple Adver. Comm'n,*
432 U.S. 333 (1977)...........................................................................17, 26

*Illinois v. Gates,*
462 U.S. 213 (1983)......................................................................................41

*Illinois v. McArthur,*
531 U.S. 326 (2001) ............................................................................ 39, 42

*Immigrant Defs. L. Ctr. v. Noem,*
145 F.4th 972 (9th Cir. 2025) ............................................... 18, 20, 22, 23

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry,*
543 F.3d 1050 (9th Cir. 2008).................................................................16

*INS v. Lopez-Mendoza,*
468 U.S. 1032 (1984) ............................................................................... 47

*Kentucky v. King,*
563 U.S. 452 (2011)............................................................................ 38, 41

*Knife Rts., Inc. v. Vance,*
802 F.3d 377 (2d Cir. 2015)................................................................... 35

*Laird v. Tatum,*
408 U.S. 1 (1972)..............................................................................24, 28

*Landon v. Plasencia,*
459 U.S. 21 (1982)................................................................................. 45

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ......................................................................... 16, 21

*Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.,*
237 F.3d 1101 (9th Cir. 2001) ............................................................. 35

*Martin* v. *Sundial Marine Tug & Barge Works, Inc.,*
  12 F.4th 915 (9th Cir. 2021) ....................................................... 46

*Matias Rauda* v. *Wilkinson,*
  844 Fed. Appx. 945 (9th Cir. 2021) ....................................... 47, 49, 50, 52

*Noem v. Vasquez Perdomo,*
  146 S. Ct. 1 (2025) ..................................................................1, 29, 32

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ................................................................ 19, 29

*Payton v. New York,*
  445 U.S. 573 (1980) ................................................................ 37

*Perez Cruz v. Barr,*
  926 F.3d 1128 (9th Cir. 2019) ................................................ 52

*Plumhoff v. Rickard,*
  572 U.S. 765 (2014) ................................................................ 34

*Rakas v. Illinois,*
  439 U.S. 128 (1978) ................................................................ 35

*Satanic Temple v. Labrador,*
  149 F.4th 1047 (9th Cir. 2025) .............................................. 20, 25

*Sherman v. United States Parole Comm'n,*
  502 F.3d 869 (9th Cir. 2007) ................................................. 49

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .................................................................. 16, 21, 33

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ..............................................................19, 26, 27, 36

*Terry v. Ohio,*
  392 U.S. 1 (1968) .................................................................... 37, 52

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021).................................................26, 31

*Trump v. CASA de Maryland, Inc.,*
    606 U.S. 831- (2025) ................................................ 34

*Tun-Cos v. Perrotte,*
    922 F.3d 514 (4th Cir. 2022) .................................... 45

*United Sav. Ass'n v. Timbers of Inwood Forest Associates,*
    484 U.S. 365 (1998)...................................................51

*United States v. Baird,*
    85 F.3d 450 (9th Cir. 1996) ......................................48

*United States v. Carloss,*
    818 F.3d 988 (10th Cir. 2016) ...................................41

*United States v. Esqueda,*
    88 F.4th 818 (9th Cir. 2023) .................................... 42

*United States* v. *Lundin,*
    817 F.3d 1151 (9th Cir. 2016) .......................11, passim

*United States v. Santana,*
    427 U.S. 38 (1976)............................................... 39, 42

*United States v. Texas,*
    599 U.S. 670 (2023)................................................... 3

*Vasquez Perdomo v. Noem,*
    148 F.4th 656 (9th Cir. 2025)................................... 34

*Young v. Borders,*
    850 F.3d 1274 (11th Cir. 2017)................................. 43

*Zepeda v. INS,*
    753 F.2d 719 (9th Cir. 1983) ....................................50

## STATUTES

5 U.S.C. § 706(2)(A) ........................................................................... 11

5 U.S.C. § 706(2)(B) ........................................................................... 11

8 U.S.C. § 1226(a) ....................................................................4, passim

8 U.S.C. § 1231(a) ........................................................................... 4, 10

8 U.S.C. § 1252(f) ................................................................................12

8 U.S.C. § 1357(a)(1) ........................................................................... 4

8 U.S.C. § 1357(a)(2) ........................................................................... 4

28 U.S.C. § 1291 .................................................................................. 2

28 U.S.C. § 1331 .................................................................................. 2

42 U.S.C. § 1983 ................................................................................ 35

## REGULATIONS

8 C.F.R. § 236.1(b)(2) .........................................................................51

8 C.F.R. § 287.5(a) ............................................................................... 4

8 C.F.R. § 287.5(c) ............................................................................... 4

8 C.F.R. § 287.5(e) ........................................................................... 4, 50

8 C.F.R. § 287.5(e)(2) ........................................................................... 4

8 C.F.R. § 287.8 .............................................................................51, 52

8 C.F.R. § 287.8(b)(2) ........................................................................ 52

8 C.F.R. § 287.8(c)(2)(ii) .....................................................................51

8 C.F.R. § 287.8(c)(2)(iv) .................................................................51

8 C.F.R. § 287.8(f) ....................................................................... 50

8 C.F.R. § 287.8(f)(2) ...........................................................5, passim

8 C.F.R. § 287.8(f)(4) ...................................................................... 5

8 C.F.R. § 287.9 .......................................................................... 52

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 54(b).................................................................2, 12

**STATEMENT IN SUPPORT OF ORAL ARGUMENT AND REGARDING CIRCUIT RULE 34-3**

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Defendants-Appellants submit that oral argument will assist the Court in resolving this appeal. This appeal addresses important standing, Fourth Amendment, and regulatory issues, as organizations and unnamed individuals seek to challenge the Executive's ability to conduct immigration enforcement in the Central District of California. Oral argument will aid the Court in evaluating the parties' arguments on whether the Plaintiffs have standing in this matter, if ICE's policies and practices relating to knock-and-talks violate the Fourth Amendment, and finally whether these policies violate the APA. Argument will help facilitate the Court's resolution of these important questions, affecting the variety of cases challenging the Executive Branch's authority over immigration enforcement in this Circuit.

x

## INTRODUCTION

The district court's decision deprives the Department of Homeland Security's ("DHS's") Immigration and Customs Enforcement ("ICE") of an imperative immigration enforcement tool in a region of the United States in which illegal immigration is "especially pronounced" as "[a]bout 10 percent of the people in the Los Angeles region are illegally in the United States— meaning about 2 million illegal immigrants out of a total population of 20 million." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025) (Kavanaugh, J., concurring in grant of stay). The district court's legally flawed decision granting Organizational Plaintiffs, Inland Coalition for Immigrant Justice (ICIJ), and the Coalition for Humane Immigrant Rights' ("CHIRLA's") motion for summary judgment and vacating ICE's policies and practices relating to "knock-and-talks"[1] directly impedes mission-critical civil immigration enforcement practices that the Executive Branch has deemed vital to law enforcement and national security. *Id.* at 5 ("The Judiciary does not set immigration policy or decide enforcement priorities.").

At the outset, this Court should reverse the district court's order because Organizational Plaintiffs and the speculative class members have

---

[1] As the district court observed, ICE uses the phrase "knock-and-talk" to describe when officers walk up to the door of a residence to speak with an occupant. *See* Excerpts of Record ("ER") 1-ER-4.

failed to establish Article III standing to obtain prospective relief. Jurisdiction aside, the district court also erroneously concluded that ICE's knock-and-talk policies and practices violate the Fourth Amendment, as it misinterpreted both Supreme Court and this Court's precedent, and failed to consider that civil immigration enforcement requires analysis distinct from the criminal context. Finally, the court's Administrative Procedure Act (APA) finding is also legally flawed, as the court erred in its interpretation of the relevant immigration regulation's use of the term "warrant."

## STATEMENT OF JURISDICTION

The U.S. District Court for the Central District of California had jurisdiction over this case under 28 U.S.C. § 1331, although Defendants contest whether Plaintiffs established Article III standing. *See infra* Argument Section I.

The district court granted Plaintiffs' motion for partial summary judgment on May 15, 2024, related to Plaintiff's knock-and-talk class claims, *see* 1-ER-2-27, and on June 24, 2025, the court entered a partial final judgment relating to the summary judgment order, *see* 2-ER-38-40. *See also* Fed. R. Civ. P. 54(b). Defendants-Appellants timely appealed on July 29, 2025. 3-ER-472-583. This Court has jurisdiction under 28 U.S.C. § 1291.

2

## STATEMENT OF THE ISSUES

I.    Whether Organizational Plaintiffs and the speculative class of unnamed individuals established Article III standing to obtain prospective relief.

II.   Whether the district court erroneously concluded that ICE's knock-and-talk policies and practices categorically violate the Fourth Amendment.

III.  Whether the district court erred in finding ICE's policies and practices violated the APA.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Framework

It is undisputed that Article II of the Constitution, which "assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed[,]'" extends to the immigration context. *See United States v. Texas*, 599 U.S. 670, 678 (2023). The Immigration and Nationality Act ("INA"), consistent with statutes enacted throughout the Nation's history, authorizes immigration officers to search for and apprehend illegal aliens to facilitate their removal from the United States. *See Abel* v. *United States*, 362 U.S. 217, 233 (1960) (collecting statutes "authoriz[ing] the arrest of deportable aliens by order of an executive official"); *see also Texas*, 599 U.S. at 679 (holding that the

3

"Executive Branch [] retains discretion over whether to remove a noncitizen from the United States"). The INA provides that suspected illegal aliens may be arrested, and detained pending removal from the United States, "[o]n a warrant issued by the [Secretary]" rather than by an independent judicial officer. 8 U.S.C. § 1226(a). The INA additionally authorizes immigration officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" without a warrant, and arrest any alien if they have "reason to believe that the alien . . . is in the United States in violation of [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(1)-(2); *see also* 8 C.F.R. § 287.5(a), (c). Moreover, the INA requires that "when an alien is ordered removed, the [Secretary] shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a).

The power and authority to issue and execute immigration warrants has been delegated to enumerated categories of immigration officers. *See* 8 C.F.R. § 287.5(e). Specifically, the regulations detail the immigration officers who may issue a warrant for the arrest of an alien on a finding of probable cause to believe the alien is removable from the United States. 8 C.F.R. § 287.5(e)(2). When conducting a targeted arrest of an alien, ICE officers must possess either a Warrant of Removal Form I-205, or a Warrant

4

for Arrest of Alien Form I-200. *See* 2-ER-230; *see also* 1-ER-4 n.6. A Warrant of Removal is based upon a final order of removal entered against the alien by either an Immigration Judge, a Designated Officer, the Board of Immigration Appeals, or a United States District or Magistrate Judge. 2-ER-230 (citing 2-ER-250-51, No. 26). Warrants of Arrest are issued for removable aliens who do not have prior orders of removal. *Id.* Moreover, the agency regulations provide that when conducting "site inspections," an ICE officer "may not enter into the non-public areas of . . . a residence including the curtilage of such residence," if the purpose is to question the occupants "concerning their right to be or remain in the United States[,] unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected." 8 C.F.R. § 287.8(f)(2); *but cf.* 8 C.F.R. § 287.8(f)(4) ("Nothing in this section prohibits an immigration officer from entering into any area of a business or other activity to which the general public has access" without a warrant or consent).

ICE officers, specifically in the Los Angeles area of responsibility ("AOR"), execute arrest warrants throughout the field using various law enforcement tactics, including the use of "knock-and-talks." 2-ER-228-30; 2-ER-251-54, Nos. 27, 29, 31. ICE officers have been trained to ensure that a knock-and-talk must occur during daytime hours, specifically 6 a.m. to 9

p.m. 2-ER-249, No. 16. The officers were taught that they may enter the curtilage of a residence to conduct the knock-and-talk under the theory of an implied license, which allows them to walk across curtilage to speak to the occupants if the general public could do so as well, and that the implied license is limited to a specific area and for the specific purpose of making contact with the occupant. 2-ER-249-50, Nos. 17-20. If the attempt to initiate a consensual encounter with the occupant of the home fails, ICE officers were trained to leave the property, according to materials presented during discovery in this matter. 2-ER-250, No. 21. Conversely, if the occupant of the home answers the door, field officers have been trained to state that they are conducting an investigation, since the officers are utilizing the knock-and-talk method for the investigation of a suspected target. 2-ER-250 Nos. 22-23.

## II. Relevant Factual Background and Procedural History

### A. The Amended Complaint and Class Certification

On April 16, 2020, individual Plaintiff, Osny Kidd, and two immigrant-rights organizational plaintiffs, ICIJ and CHIRLA, initiated this lawsuit against DHS and ICE challenging ICE's search and arrest practices

related to knock-and-talks.[2]  3-ER-419-71.  On October 27, 2020, Plaintiffs filed their First Amendment Complaint with the district court, in which they alleged that "Defendants have a policy and practice of entering community members' homes and surrounding curtilage without a judicial warrant or permission, and with the intent to conduct warrantless immigration arrests," in violation of the Fourth Amendment and the APA. 3-ER-409-12.

During discovery, the parties entered stipulations to help limit the scope of the case, which included Defendants agreeing that they would "not argue or claim that an administrative warrant (I-200) or warrant of removal (I-205) provides the Government the legal authority to enter a residence or other location in which an individual has a reasonable expectation of privacy under the Fourth Amendment" and that they would not argue "that the presence of such warrant is a factor supporting any defense by Defendants in this action, in the District Court or on appeal."  3-ER-363, Stip. 22.

---

[2] Plaintiffs also challenged ICE's alleged "ruses" to gain access to suspects' homes or induce them to come outside, and Kidd brought individual tort and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) claims.  *See Kidd* v. *Mayorkas*, No. 23-55170 (9th Cir. Mar. 30, 2023) (declining interlocutory appeal of the district court's denial of a motion to dismiss the *Bivens* claims).  Due to dismissal or settlement, only the knock-and-talk claims remained.  *See* 1-ER-8.  The district court approved the proposed settlement related to the ruse claims and entered final judgment on August 5, 2025.  2-ER-29-37.

On February 7, 2023, the district court granted ICIJ and CHIRLA's motion to certify two classes of individuals who have been or will be affected by Defendants' alleged unconstitutional practices, the "ruse" class and the "knock-and-talk" class.[3] 2-ER-256-79. Relevant here, the knock-and-talk class included "[a]ll individuals residing at a home in the [Los Angeles AOR] where ICE has conducted or will conduct a warrantless civil immigration enforcement operation using a 'knock-and-talk.'" 2-ER-267.

## B. Parties' Motions for Summary Judgment and the District Court's May 15, 2024 Order

On November 20, 2023, both parties filed partial cross-motions for summary judgment as to the knock-and-talk class claims. 2-ER-221-44; 2-ER-148-76. The Organizational Plaintiffs on behalf of themselves and the certified knock-and-talk class sought summary judgment on their claims challenging "Defendants' policy and practice of unlawfully entering the curtilage of home to arrest class members for alleged civil immigration violations."[4] 2-ER-157. Defendants sought summary judgment arguing that Plaintiffs' knock-and-talk claims failed as a matter of law. *See* 2-ER-221-44.

---

[3] Defendants have not appealed the district court's order granting class certification, and therefore the viability of the class is not before the Court.
[4] The only individually named Plaintiff, Kidd, did not assert that he
(continued next page)

On May 15, 2024, the district court granted Plaintiffs' partial motion for summary judgment, and denied Defendants' motion. 1-ER-2-27. The Court's summary judgment order declared that ICE's system-wide knock-and-talk practices of entering the curtilage of homes without consent or a judicial warrant for the purpose of arresting the occupant violated the Fourth Amendment and the APA. 1-ER-10-21. The district court first held that ICE's "policy and practice of entering the curtilage of homes and knocking on the door, not merely to talk to residents but to arrest them" violated the Fourth Amendment. 1-ER-10-18. The court noted that when ICE officers conduct a knock-and-talk, they "physically encroach on and occupy the curtilage of an individual's home[,]" and lack a "judicial warrant, express consent, or some other exception to the warrant requirement[.]" 1-ER-11. The court rejected Defendants' argument that ICE officers' possession of administrative arrest warrants satisfied the Fourth Amendment. 1-ER-11-14. The court explained that the issue was not whether the arrest was authorized, but rather whether the "consensual encounter" leading up to an arrest was proper. 1-ER-11-12.

---

experienced a knock-and-talk. 2-ER-208, No. 69. Kidd experienced only alleged ruse actions. *Id.* (noting Kidd was not present during the knock-and-talk). Because the ruse class's claims were settled, 2-ER-29-37, the only remaining Plaintiffs are the two organizations, CHIRLA and ICIJ, and the unnamed class members. 1-ER-4.

The court explained that Defendants agreed in a prior stipulation that they would not argue that "that the presence of such warrant is a factor supporting any defense by [the government] in this action." 1 - ER-12 (citing 3-ER-363, Stip. 22). The court noted that Defendants were precluded from arguing that administrative warrants provided the legal authority for the ICE officers to enter "a residence or other location in which an individual has a reasonable expectation of privacy," which included the curtilage of a home. 1-ER-12. Nevertheless, the court determined that even if it were to consider administrative warrants, an administrative warrant did not constitute a sufficient basis upon which an ICE officer may enter the constitutionally protected areas of a home. 1-ER-12-13. The district court acknowledged that 8 U.S.C. §§ 1226(a) and 1231(a) authorize the arrest of aliens with an administrative warrant and makes no reference to a judicial warrant. Yet, the court held that administrative warrants "lack the independent assurance guaranteed by the Fourth Amendment" and therefore did "not immunize Defendants' conduct." 1-ER-13. The district court noted that the Supreme Court in *Abel* v. *United States,* 362 U.S. 217 (1960) did not decide whether an administrative warrant satisfied the requirements for warrants under the Fourth Amendment. 1-ER-13.

10

The district court rejected Defendants' argument that the officers have an "implied license to enter the curtilage of an individual's residence" to carry out an administrative arrest. 1-ER-14-18. The court relied on *United States* v. *Lundin*, 817 F.3d 1151 (9th Cir. 2016), finding that it stood for the proposition that an officer entering the curtilage with the intent to arrest the occupant exceeds the implied license. 1-ER-17-18. The court explained that because ICE officers are trained that they can enter the constitutionally protected areas of a home for the purpose of arresting the occupant, rather than approaching with the intent to ask the occupant questions, the practice and policies were barred under *Lundin* and exceeded the scope of implied consent. 1-ER-17-18.

The district court next held that ICE's knock-and-talk policies constituted both a regulatory and constitutional violation of the APA. 1-ER-18-21; 5 U.S.C. § 706(2)(A)-(B). The court held that Defendants' systematic conduct of entering persons' curtilage without a judicial warrant with the intent to arrest the occupant violated 8 C.F.R. § 287.8(f)(2). 1-ER-18-21. In rendering this holding, the court concluded that the regulation's use of the term "warrant" referred to a judicial warrant, and not administrative warrant. 1-ER-20-21. The court additionally found that Plaintiffs

11

sufficiently established that Defendants' policy and practice regarding knock-and-talks constituted a constitutional violation. 1-ER-21.

Lastly, the district court determined that it would issue the declaratory relief of vacating and setting aside Defendants' policies and practices allowing officers within the Los Angeles AOR to engage in knock-and-talks in the manner the court held to be unlawful. 1-ER-24-26. The court reasoned that a vacatur, as compared to an injunction, provided a "less drastic remedy" and would allow Defendants the "opportunity to develop a policy and practice that reaches the same or similar result as the vacated agency action, but in a constitutional manner." 1-ER-25-26 (internal quotations omitted). The district court held that the declaratory relief was not precluded by 8 U.S.C. § 1252(f). 1-ER-22-24 (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)).

While the district court's partial summary judgment remained nonfinal for about a year, on May 23, 2025, Defendants moved for the district court to enter a partial final judgment of the summary judgment order under Federal Rule of Civil Procedure 54(b) to facilitate appellate review. 2-ER-41-49. On June 24, 2025, the district court granted that motion and entered final judgment for Plaintiffs on the knock-and-talk summary judgment

12

order. 2-ER-38-40. Defendants timely appealed the court's underlying summary judgment order on July 29, 2025. 3-ER-472.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's declaratory judgment and vacatur of ICE's knock-and-talk policies as violating the Fourth Amendment and the APA. The court's judgment is fatally flawed on multiple grounds.

First, plaintiffs lack Article III standing to seek the prospective relief awarded here. CHIRLA and ICIJ lack organizational standing, as their purported injuries amount to mere disagreement with federal enforcement policy and a diversion of resources. CHIRLA and ICIJ also lack associational standing both for their members and as class representatives because they identify no individuals with a concrete injury and this Court cannot find associational standing where the record demonstrates none. Both Plaintiffs and class members lack standing to pursue prospective declaratory relief and vacatur based on their failure to demonstrate any real and immediate future harm. Fourth Amendment rights are also personal rights that cannot be vicariously asserted.

On the merits, the district court's Fourth Amendment holding was erroneous. In reasoning that Defendants' practice surrounding the use of a knock-and-talk violated the Fourth Amendment, the district court

13

misapplied this Court's decision in *Lundin*. While this Court in *Lundin* found that the knock-and-talk exception to the warrant requirement did not apply when officers entered the curtilage of a home at 4 a.m. with the intent to arrest the occupant, this Court did not create a bright-line rule that applies to every inquiry of whether a Fourth Amendment search is objectively reasonable. Rather, the Fourth Amendment requires a totality-of-the-circumstances approach, in which a court balances various factors in determining the reasonableness of the challenged officer's actions.

The district court's reading of *Lundin* to assert a bright-line rule that no officer can ever enter the curtilage with the intent to arrest the occupant without a judicial warrant, and applying it to find that ICE's policies violated the Fourth Amendment, is gravely flawed and should be reversed on this basis alone. Nevertheless, the court also erred in failing to consider that the civil immigration enforcement at issue in this case is civil in nature and thus distinct from the criminal context.

Finally, the district court's conclusions related to the APA violations are also unsupported. Specifically, the court erred in finding the practices to be inconsistent with 8 C.F.R. § 287.8(f)(2) and unconstitutional. The court supported its findings on an isolated view of the regulation, rather than considering the INA and other sections of the regulations which specifically

14

authorizes immigration officials to issue both search and arrest administrative warrants.

This Court should therefore reverse.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's order granting summary judgment. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 705 (9th Cir. 2026). In doing so, the Court must view "the evidence in the light most favorable to the non-moving party . . . [and] decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001).

## ARGUMENT

### I. Both Organizational Plaintiffs and the Speculative Class of Unnamed Individuals Lack Article III Standing

As a threshold matter, this Court should reverse the district court's declaratory judgment and vacatur because Plaintiffs lack standing to seek such relief. Plaintiffs must establish standing for each claim and each form of relief they seek. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 185 (2000) (same). While the district judge did not separately address standing

15

in granting Plaintiffs' request for summary judgment, this Court must address standing on appeal. *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000) ("Federal courts are always under an independent obligation to examine their own jurisdiction[.]") (internal quotations omitted); *Ctr. for Biological Diversity v. Exp.-Import Bank of the United States*, 894 F.3d 1005, 1011 (9th Cir. 2018) (holding that a court must ensure that it "possess jurisdiction at every stage of the litigation") (internal quotation omitted). Standing cannot be waived, and indeed must be raised and addressed whenever it is in doubt. *See City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 845 (9th Cir. 2009); *see also Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1064–65 (9th Cir. 2008).

To establish Article III standing, Plaintiffs must first show that they have suffered a concrete and particularized injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Second, Plaintiffs must establish a causal connection between the injury and Defendants' conduct. *Id*. Third, Plaintiffs must show a likelihood that the injury will be redressed by a favorable decision. *Id.*; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (explaining that for each particular form of relief, a plaintiff must show that the requested relief will redress his injury). The Supreme Court has recognized that "organizations may have standing 'to sue

16

on their own behalf for injuries they have sustained'" as long as the organization "satisfy[ies] the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395-96 (2024) ("*Alliance*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982)).  In contrast, associational standing may apply when an organization pursues claims on behalf of their members' alleged injuries.  *See Alliance*, 602 U.S. at 398 (Thomas, J., concurring).  Associational standing requires proof that the organizations' members "would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Moreover, to seek prospective relief, plaintiffs must show a real and immediate risk of future injury to them, and cannot rely merely on past conduct or generalized allegations.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013); *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 105-06 (1983).

### A. Plaintiffs Have Failed to Demonstrate Organizational Standing

CHIRLA and ICIJ lack organizational standing, and the district court's implicit reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982),

17

and its progeny was misplaced.[5]  An organization asserting standing based on its own alleged injuries must show: "(1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable." *Alliance*, 602 U.S. at 395-96.

Organizational standing exists only when the Defendant's conduct directly impairs the organization's ability to carry out a pre-existing core service causing harm, and not when it merely frustrates policy goals or prompts voluntary advocacy expenditures. *See id.*; *Havens*, 455 U.S. at 378-79; *cf. Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987-89 (9th Cir. 2025) ("*Immigrant Defenders*").  In *Alliance*, the Supreme Court rejected the notion that, under *Havens*, an organization has standing whenever it "diverts its resources in response to a defendant's actions." 602 U.S. at 395. Rather, "an organization that has not suffered a concrete injury caused by a defendant's action cannot *spend its way into standing* simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394 (emphasis added).  *Alliance*'s rationale makes clear that an

---

[5] As noted earlier, the only individually named Plaintiff, Kidd, alleged only an ICE ruse, rather than a knock-and-talk. 2-ER-208, No. 69.  The only named Plaintiffs remaining are the two organizations, CHIRLA and ICIJ. 1-ER-4.

18

organization cannot change its core business activities in response to a government policy as a maneuver to establish standing. *Id.* Stated differently, its activities must be assessed as they existed prior to adoption of the challenged policy. Moreover, the institutional impairment requirement here acts to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection" to Defendants' knock-and-talk practices. *Id.* at 368.

*Alliance* also reaffirms that standing to pursue prospective relief cannot be grounded on "speculative" future injuries. *Id.* at 390. A plaintiff seeking prospective relief must show a threat of future injury that is "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past wrongs may serve as evidence of a "real and immediate threat of repeated injury," but they are insufficient on their own to support standing for prospective relief. *Lyons*, 461 U.S. at 102-03. Along with past wrongs, the organization must allege either "continuing, present adverse effects" or a "sufficient likelihood that [it] will again be wronged in a similar way." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (recognizing that past harm "[d]oes not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects"). Distinguishing the Supreme

19

Court's decision in *Alliance*, this Court found that the organization in *Immigrant Defenders* had standing where the "Remain in Mexico" policy physically prevented a legal-services organization's attorneys from reaching clients, making in-person representation impossible and thereby disabling the core service of providing in-person legal representation.[6]  145 F.4th at 987-89.

Under both *Havens* and *Immigrant Defenders*, Defendants' knock-and-talk actions do not provide the type of direct organizational injury required to satisfy Article III.  *See also Satanic Temple v. Labrador*, 149 F.4th 1047, 1053-54 (9th Cir. 2025) (holding that expenditures and operational choices did not confer standing because Idaho's laws did not impede pre-existing core activities—its advocacy, education, and religious messaging remained fully operational).  Under *Alliance*, both CHIRLA and ICIJ must show that Defendants' use of knock-and-talks in the Los Angeles AOR "directly" affected its pre-existing "core business activities."  603 U.S. at 395.  Both organizations have failed to make this showing.  While the district court never analyzed Article III standing directly, its implicit finding

---

[6] This Court is currently considering *en banc* a similar issue related to standing and the effect of *Alliance* on circuit precedent in *Arizona All. for Retired Americans v. Mayes*, 130 F.4th 1177 (9th Cir. 2025).  Additionally, the government has filed a petition for rehearing *en banc* in *Immigrant Defenders*, which is currently pending.

20

necessarily presupposed *Havens*–style organizational injury. 2-ER-256-79; *see also* 1-ER-8 ("The Coalition Plaintiffs, on behalf of themselves and the certified 'Knock-and-talk' Class, seek summary judgment on their claims challenging Defendants' policy and practice of entering the curtilage of homes to arrest class members for alleged civil immigration violations."). That approach cannot be reconciled with the Supreme Court's decision in *Alliance*, and Plaintiffs accordingly lack organizational standing. *See Steel Co.*, 523 U.S. at 94-95, 101-02.

Specifically, CHIRLA and ICIJ only identify *voluntary* resource expenditure in modifying some of their functions to reflect their "general legal moral, ideological, or policy objection" to ICE's knock-and-talk guidance. *See Havens*, 455 U.S at 379; *Alliance*, 602 U.S. at 368-70; *see also* 3-ER-398-406, Nos. 102-38. Notably, a glaring defect exists: in discussing organizational injuries, neither mentions any advocacy choice whatsoever which is tied to Fourth Amendment issues or knock-and-talks, as Plaintiffs only mention "home arrests," without differentiating between lawful home arrests and unlawful home arrests, or from knock-and-talks and ruses. *See* 3-ER-398-406, Nos. 102-38. That alone should defeat organizational standing for this issue. *See Lujan*, 504 U.S. at 560-62 (holding that claimed harm which is not related to injury does not suffice). Nonetheless, the

21

complaint's contention confirms the Article III defect, as neither organization alleges that ICE's Fourth Amendment guidance disabled any existing service, altered the conditions necessary to deliver that service, or prevented staff from performing core operational functions. 3-ER-398-406, Nos. 102-38; *see Havens*, 455 U.S at 379; *Immigrant Defenders*, 145 F.4th at 987-89 (holding that the organization was "similarly situated to the plaintiff organization in *Havens*," where the defendants' conduct "directly affected and interfered with" the organization's "core business activities") (internal quotations omitted).

ICIJ's allegations underscore that its asserted harm is resource diversion, not impairment. *See* 3-ER-398-402, Nos. 106-21. Specifically, the complaint lacks any evidence suggesting that ICE's knock-and-talk guidance rendered any preexisting organizational service inoperable, or even degraded; instead, ICIJ describes voluntarily reallocating staff time and funds toward activities which included intake, referrals, bond assistance, humanitarian support, hotline response, community education, and expanded Know-Your-Rights programming. 3-ER-398-402, Nos. 106-21. These are self-initiated expansions of advocacy and support efforts, not the "direct impairment" of a core, preexisting service. *Havens*, 455 U.S at 379.

22

CHIRLA's allegations likewise describe discretionary diversions of resources. *See* 3-ER-404-05, Nos. 129-34. The complaint shows CHIRLA redirected personnel across its Policy, Organizing, Community Education, External Affairs, and Legal Services departments to conduct intakes, investigate ICE activity, field hotline calls, deliver presentations, raise humanitarian funds, and develop new outreach materials. 3-ER-404-05, Nos. 129-34. These allegations show advocacy-centric, voluntary diversion, not a direct impairment of core "services." *Havens*, 455 U.S at 379; *Immigrant Defenders*, 145 F.4th at 987-89. Unlike the organization in *Immigrant Defenders*, ICIJ and CHIRLA could have chosen *not* to respond ICE's practice and continued its operations. *See* 145 F.4th at 987-89 (the legal center was forced to modify its operations to continue to operate).

CHIRLA and ICIJ's allegations place them squarely within types of actions that *Alliance* held would not suffice to establish organizational standing. ICIJ alleged that ICE's home-arrest practices frustrated their missions, but ICIJ decided to act based on their "general legal, moral, ideological, or policy objection[s]" to these practices. *Alliance*, 602 U.S. at 368. In certifying the knock-and-talk class, the district court adopted this constitutionally incompatible theory wholesale, concluding that "both organizations have been forced to divert resources from other core priorities

23

to assist individuals impacted by the challenged home arrest practices." 2-ER-263-64. However, neither organization alleges that Defendants' practices made an existing program impossible or even impracticable to operate. *See, e.g.*, 3-ER-365-418. In fact, these initiatives naturally fall into the organizations' existing programs. 3-ER-371-72, Nos. 15-16. Thus, under *Alliance*, Plaintiffs' attempt to establish organizational standing based on their voluntary organizational choices fails. 602 U.S. at 378-79.

Nor do Organizational Plaintiffs' "climate of fear" allegations bridge the gap to establish standing. At most, ICIJ asserts that some community members "prefer to limit their public engagement" at meetings and events, and CHIRLA alleges that some members have been "discouraged" from attending events or sharing personal stories. 3-ER-399, No. 106; 3-ER-404, No. 131. Such speculative, third-party reactions to general enforcement practices are too attenuated to qualify as a concrete organizational injury. *See Clapper*, 568 U.S. at 409-14. The fear-based allegations Plaintiffs made rest on conjecture about who might be targeted in the future, and the organizations' choice to respond through additional hotlines, workshops, and campaigns are a "self-inflicted" policy response rather than a legally cognizable injury. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (concluding that allegations of "subjective chill" rooted in community fear or reluctance

24

to engage do not establish injury in fact without a showing of specific, imminent harm to the plaintiff's own operations).

Ultimately, Organizational Plaintiffs' case mirrors *Alliance*, as Plaintiffs disagree with federal enforcement policy, claim it frustrates their mission, and on their own chose to "divert" time and money to respond. 602 U.S. at 378-79; *see also Satanic Temple*, 149 F.4th at 1053-54. Thus, Plaintiffs' speculation as to a future injury is not "*certainly* impending" and is insufficient to establish standing. *Clapper*, 568 U.S. at 411-12.

## B. Plaintiffs Have Failed to Demonstrate Associational Standing Because Declaratory Relief Requires a Showing of Real and Immediate Future Harm

CHIRLA and ICIJ additionally lack associational standing both for their members and as class representatives because they identify no individuals with a concrete injury and this Court cannot find associational standing where the record demonstrates none. *See, e.g.*, 3-ER-350 (Plaintiffs' request for certified class, noting "[t]he Plaintiff Coalitions may serve as class representatives because each has associational standing to bring claims on behalf of its members, many of whom are putative class members who stand to be harmed by the challenged practices absent judicial intervention."). Associational standing requires proof (*inter alia*) that an organization's "members would otherwise have standing to sue in their own

right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Alliance*, 602 U.S. at 398 (Thomas, J., concurring) (quoting *Hunt*, 432 U.S. at 343).

Plaintiffs fail to demonstrate associational standing because neither CHIRLA nor ICIJ identified, even pseudonymously, a single member who experienced, or faces an imminent risk of experiencing, a knock-and-talk conducted by the Defendants. *See* 3-ER-365-418. Without a member who "would otherwise have standing to sue," the Supreme Court in *Hunt* has held that this ends the inquiry. 432 U.S. at 343; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (reinforced the rule that Article III requires a concrete, particularized injury to an actual person, not a statistical, probabilistic, or hypothetical harm); *cf. Healy*, 164 F.4th at 708 (9th Cir. 2026) (reiterating that "*TransUnion*'s instruction that plaintiffs must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation.") (internal quotations omitted). Moreover, associational standing squarely forbids relying on general fears or speculation about unnamed individuals who might be affected at some unknown future time. *See Summers*, 555 U.S. at 496-97.

In Petitioners' amended complaint, CHIRLA alleged that its membership "includes citizens and noncitizens who have been subjected to

26

and are at risk of being subjected" to an ICE home search or arrest. 3-ER-372-73, No. 16. ICIJ similarly alleged that "some volunteer members" are undocumented or live with undocumented family members and therefore face a "real and present risk" of undergoing an ICE knock-and-talk arrest. 3-ER-372, No. 15. But neither organization identifies who these members are, whether any have ever experienced an ICE knock-and-talk, much less an arrest, or whether any are personally likely to be subjected to one in the future. *See generally* 3-ER-365-418. These allegations effectively assert only that "some of our members might be affected," a theory the Supreme Court in *Summers* rejected as incompatible with Article III because it fails to link the claimed harm to any identifiable individual. 555 U.S. at 496-97 (rejecting standing where plaintiffs "failed to identify a particular member" even though some unidentified individuals were statistically at risk).

Additionally, the complaint lists nine alleged unlawful victims of ruses and "fictitious police investigations," yet Plaintiffs failed to put forth a single member who experienced a knock-and-talk.[7] 3-ER-385-92, Nos. 51-92.

---

[7] The only narrative in the amended complaint that *could* be construed as ICE conducting a knock-and-talk in the past is Cruz Mannuel Reyes Maldonado. *See* 3-ER-388 ¶¶ 67-68. However, Plaintiffs explain that when Maldonado heard the knock on the door and believed the officers to be "POLICE," he opened it, consented to their request for his name and identification, and voluntarily stepped outside. *Id.*

27

Plaintiffs' allegation in their complaint that members experience fear, reluctance to attend meetings, or "distrust" of law enforcement, does not supplant the requirement to identify any member who faces a non-speculative threat of such conduct. *See, e.g.*, 3-ER-399, Nos. 106-07; 3-ER-404-05, Nos. 131-34; *see also Laird*, 408 U.S. at 13-14 ("subjective chill" is not itself an injury in fact absent an objective threat of enforcement); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (finding no Article III injury where enforcement risk was "wholly conjectural," underscoring that speculative future harm cannot establish a concrete threat).

Moreover, Petitioners' motion for summary judgment contained various narratives which they argued constituted evidence of individuals who have experienced knock-and-talks in the past. *See* 2-ER-208-15, Nos. 69-81. However, Defendants' contested Plaintiffs' "Uncontroverted Facts" narratives and lodged various evidentiary objections, *see* 2-ER-77-147, but the court chose to reject or find these moot, *see* 1-ER-6 n.8. Even if this Court were to take the narratives as truth in evaluating whether Plaintiffs demonstrated a past injury necessary for standing, the only narrative which indicated a *possible* improper knock-and-talk was that of Ortega Osorio, who alleged that officers grabbed him through the doorway and took him outside to place him under arrest. *See* 2-ER-136-37, No. 76. However, Defendants'

objection to this statement indicates that Osorio provided the officers with consent to enter his home. *See* 2-ER-136-37, No. 76. The additional narratives, while using the term "knock-and-talk," do not demonstrate the prohibited behavior Organizational Plaintiffs claim to have happened. *See* 2-ER-208-15, No. 69-81. Instead, the narratives show ICE's use of ruses, instances where the alien was not actually home at the time, or the alien or another individual either voluntarily identified themselves or stepped outside. *Id.*

Because CHIRLA and ICIJ cannot rely on generalized assertions, and they fail to produce a member-linked injury, they cannot demonstrate associational standing. *See Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096-99 (9th Cir. 2021) (finding that the organization held standing because a member teacher personally experienced exposure to contamination which was supported by a submitted a declaration establishing her injury).

Even assuming Plaintiffs' members and class members underwent a past ICE knock-and-talk, Organizational Plaintiffs and class members lack standing to pursue declaratory relief under both *Lyons* and *Perdomo* based on their failure to demonstrate any real and immediate future harm. *Lyons*, 461 U.S. at 101-11; *Vasquez Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J., concurring); *see also O'Shea*, 414 U.S. at 494 ("Abstract injury is not enough.

29

It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct."). In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that, while the plaintiff could pursue a damages claim for that past injury, he lacked standing for prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. There was no "immediate threat" that he would again be "choke[d] . . . without any provocation or resistance on his part." *Id.* That was so even though the Court accepted that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* Under *Lyons*, a plaintiff may not obtain a declaration regarding the legality of ongoing government practices unless he demonstrates a dispute of "sufficient immediacy and reality"—that is, a sufficient likelihood of repeat injury, rather than mere probability that harm might occur, as to his own future exposure. *Id.* at 109-10.

*Lyons* forecloses Plaintiffs' implicit alleged past-is-prologue theory of standing. CHIRLA and ICIJ contend that their respective membership and class members include citizens and aliens who are at risk of being subjected to a purported illegal ICE knock-and-talk. 3-ER-369, Nos. 7-8. Their

30

declarations and the complaint, which consist now of mostly stale evidence, describe only past ICE operations and generalized fears that such practices "will continue" somewhere in the Los Angeles AOR. *See* 1-ER-26-27 (citing CHIRLA and ICIJ declarations); 2-ER-216-20 (declaration that individual "learned" at a CHIRLA advocacy meeting that knock-and-talks have occurred in the past, but had not experienced or otherwise had personal knowledge of these knock-and-talks").

The district court accepted an alleged real and immediate threat if the ICE knock-and-talk policy and practice continued, but the court failed to identify any realistic immediate threat *to Plaintiffs*—the essence of the standing inquiry. *See TransUnion LLC*, 594 U.S. at 423. In *Lyons*, it was insufficient that the police department was generally likely to continue to employ chokeholds; what mattered was whether the *plaintiff* there would likely be subject to a chokehold again. So too here, it is insufficient that the district court deemed federal agents would continue employing knock-and-talks in the Los Angeles AOR. What matters is that *Petitioners* cannot show that their members or class members will likely undergo an allegedly unconstitutional ICE knock-and-talk in the future. *See also Clapper*, 568 U.S. at 401 (holding that "an objectively reasonable likelihood that their communications will be acquired under [that program] at some point in the

31

future . . . [wa]s too speculative to satisfy the well-established requirement that threatened injury must be certainly impending"). Plaintiffs cannot establish that their members or class members will likely face future knock-and-talks to establish standing "merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves," *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (Kennedy, J.), and then claiming that future injury is likely solely because of generalized fear in their community.

The Supreme Court's recent decision granting the Government's request for a stay of the district court's order in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025) reinforces that point. Justice Kavanaugh, concurring in the grant of a stay, explained that both individual and organizational plaintiffs likely lacked Article III standing in their challenge of investigative immigration stops in the Los Angeles area. *Vasquez Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J., concurring). Justice Kavanaugh emphasized that standing for forward-looking relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence"; what matters is the "reality of the threat of repeated injury," not "subjective apprehensions." *Id.* (quoting *Lyons*, 461 U.S. at 107 n.8). Justice Kavanaugh rejected the argument, parallel to Plaintiffs' here, that past encounters plus the

32

Government's ongoing enforcement in Los Angeles sufficed, because plaintiffs lacked any good basis to think unlawful encounters against them were imminent. *Id.* The same is true here: nothing in this record suggests ICE is imminently likely to conduct a knock-and-talk on any particular Organizational Plaintiff member or class member in such a way that would demonstrate standing.

Allowing Plaintiffs to convert a generalized policy disagreement of ICE's future enforcement operations untethered to any actual injury would collapse Article III into an advisory-opinion regime, which the Supreme Court has continuously cautioned against and rejected. *See Steel Co.*, 523 U.S. at 101 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning."); *Alliance*, 602 U.S. at 378-89; *see also Allen v. Wright*, 468 U.S. 737, 760 (1984) (rejecting grievance of plaintiffs wanting to use the judiciary "to press general complaints about the way in which government goes about its business"). As *Lyons* put it, "[a]bsent a sufficient likelihood that [a plaintiff] will again be wronged in a similar way," he is "no more entitled to [prospective relief] than any other citizen," and a federal court "may not entertain a claim by any or all citizens who no more than assert that certain practices of law

33

enforcement officers are unconstitutional." 461 U.S. at 111-12. The same logic applies to declaratory judgments about those practices. Plaintiffs have attempted to project standing onto those individuals who have no stake in this case and essentially on behalf of an entire region, and the district court ostensibly followed suit in certifying this class and improperly granting their motion for summary judgment. Plaintiffs, however, cannot salvage standing by purporting to represent unnamed residents of the Los Angeles AOR who may in the future experience an ICE knock-and-talk for the purpose of civil immigration enforcement. Article III does not permit such "free-floating" attempts to vindicate the rights of non-members. *See, e.g.*, *Trump v. CASA de Maryland, Inc.*, 606 U.S. 831-32 (2025).

Moreover , it is inappropriate for the Organizational Plaintiffs to assert standing and allege Fourth Amendment violations based on their group's members or the speculative class members. It is well-established that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014); *but see Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 n.10 (9th Cir. 2025) (holding in the denial of Defendant's request for a stay, later vacated by the Supreme Court, that Defendants' citation to cases relating to whether an association can a

34

civil rights "claim based on the violation of a third party's Fourth Amendment rights" were inapplicable in that case).  In *Rakas v. Illinois*, the Supreme Court "decline[d] to extend the rule of standing in Fourth Amendment cases" to the petitioners, as the petitioners did not experience any Fourth Amendment violation.  439 U.S. 128, 133-134 (1978).  This requirement applies similarly to civil rights actions under 42 U.S.C. § 1983.  *See Knife Rts., Inc. v. Vance*, 802 F.3d 377, 387 (2d Cir. 2015); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001).  This logically follows, as Fourth Amendment claims are too fact-specific and context-dependent to satisfy the requirements of organizational standing or class actions.  For instance, in *Black Lives Matter L.A. v. City of Los Angeles*, this Court in reviewing the certification of a class addressed Fourth Amendment claims from a group of plaintiffs, and held that "[w]hether the use of tight handcuffs violates the Fourth Amendment, like other excessive force issues, is usually fact-specific and likely to turn on the credibility of the witnesses[,]" and is thus ill situated for a class-action claim.  113 F.4th 1249, 1258-1262 (9th Cir. 2024).

In sum, no Organizational Plaintiff or class member can show a real and immediate threat that they—not someone else—will in the future be subject to an ICE knock-and-talk.  Thus, the district court lacked jurisdiction

35

to issue prospective relief related to the Fourth Amendment and APA claims, and this Court should reverse the lower court's judgment. *See Summers*, 555 U.S. at 498 (holding that standing based on the mere "statistical probability that some of [the organization's thousands of] members are threatened with concrete injury" would "make a mockery of [the Court's] prior cases," and instead plaintiffs must prove specific, concrete allegations of harm to one or more "*identified* member[s]" of an organizational plaintiff).

## II. The District Court's Summary Judgment Order Should Be Reversed Based on the Court's Erroneous Fourth Amendment Analysis

The district court further erred by misinterpreting Fourth Amendment case law. *See* 1-ER-11-18. This Court should reverse the district court because ICE's practice of using knock-and-talks does not violate the Fourth Amendment. Importantly, this Court need not reach whether ICE officers have an administrative warrant when they execute knock-and-talks, because the court court erroneously failed to recognize that ICE, like any other person or law enforcement agent, has an implied license to enter the curtilage to approach a resident's door and that the Supreme Court has held that an officer does not need a warrant to arrest a person in the doorway of a home. In any event, this Court may also find that the district court erred in its

36

holding that ICE's use of administrative warrants is not sufficient under the Fourth Amendment.

### A. The District Court Misapplied *Lundin* and Improperly Restricted ICE's Lawful Use of an Implied License to Execute Knock-and-Talks

1.     The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[T]he central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968); s*ee Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016) ("[R]easonableness is always the touchstone of Fourth Amendment analysis."). The Fourth Amendment by default requires a warrant that is issued by a neutral magistrate for government to conduct "searches" or "seizures" of "their persons" or "houses." *See Payton v. New York*, 445 U.S. 573, 586 & n.25 (1980).

Notably, "the area 'immediately surrounding and associated with the home'" is known as "the curtilage" and is considered "'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Despite the curtilage being considered part of the home for Fourth Amendment purposes, the Supreme Court has found that there is an

37

"implicit license [that] typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Thus, the Supreme Court has held that officers do not violate the Fourth Amendment by approaching a residence without a judicial warrant to knock on the door, "precisely because that is 'no more than any private citizen might do.'" *Id.* at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

In *Jardines*, the Supreme Court concluded that the officers went beyond the scope of the implied license to enter the curtilage, when they approached Jardines's front porch, did not knock, and used a "trained police dog to explore the area around the home in hopes of discovering incriminating evidence[.]" 569 U.S. at 5-6, 9. The Court explained that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose . . . the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 9. Moreover, in addressing the government's contention that the subjective intent of an officer is irrelevant, the Court held that the question at issue was whether the officer conducted an objectively reasonable search. *Id.* at 10. The Court clarified that the objectively reasonable inquiry "depends upon whether the officers had an implied

38

license to enter the porch, which in turn depends upon the purpose for which they entered." *Id.* Because the officers' "behavior objectively reveal[ed] a purpose to conduct a search" of Jardines' porch, it went beyond "what anyone would think [they] had license to do." *Id.*; *see also id.* at 9 n.4.

The Supreme Court in *Jardines* did not hold that the subjective intent of the officers is always dispositive in evaluating their conduct and whether they exceeded the scope of an implied license. 569 U.S. at 9-10. Rather, the Court stressed the need to evaluate whether the behavior was objectively reasonable and clarified that it was not holding that an officer can never discover information when encroaching someone's curtilage, but it must be within "the course of engaging in [] permitted conduct." *Id.* at 9 n.4; *see also id.* at 22 (Alito, J., dissenting).

Moreover, the Supreme Court has further recognized that "a person standing in the doorway of a house is 'in a 'public' place,' and hence subject to arrest without a warrant permitting entry of the home." *Illinois v. McArthur*, 531 U.S. 326, 335 (2001) (quoting *United States v. Santana*, 427 U.S. 38, 42 (1976)).

2.     In holding that Defendants' knock-and-talk practices violated the Fourth Amendment, the district court misapplied this Court's decision in *United States v. Lundin*, 817 F.3d 1151 (9th Cir. 2016), to improperly restrict

39

the implied license to enter a home's curtilage.  1-ER-14-18.  In an appeal challenging suppression of evidence, this Court in *Lundin* held that the officers in that case "exceeded the scope of the customary license to approach a home and knock."  *Id.* at 1159.  First, the Court noted that "unexpected visitors are customarily expected to knock on the front door of a home only during normal waking hours," and because the officers in that case knocked on the door around 4:00 a.m. "without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance," the Court held that the officers exceeded the scope of the implied license.  *Id.*

Second, the Court addressed *Jardines* and held that "the scope of a license is often limited to a specific purpose . . . and the customary license to approach a home and knock is generally limited to the purpose of asking questions of the occupants[.]"  *Id.* (internal quotations omitted).  The Court noted that after *Jardines*, "the knock and talk exception depends at least in part on an officer's subjective intent."  *Id.* at 1160.  Taking it further, the Court held that the "knock and talk exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant."  *Id.*  Ultimately, the Court in *Lundin* held that the officer's 4:00 a.m. knock-and-talk without a warrant with the intent to arrest

40

Lundin violated his "Fourth Amendment right to be free from unlawful searches when they stood on his porch and knocked on his front door." *Id.*

Here, the district court held that ICE's knock-and-talk practice and policies violate the Fourth Amendment because they exceed the scope of the customary implied license to enter the curtilage of a home. 1-ER-14-18. The court relied on *Lundin* stating that it "stands for the clear proposition that 'the knock and talk exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant.'" 1-ER-16 (citing *Lundin*, 817 F.3d at 1160). The court held that under *Lundin*, ICE's practice of conducting knock-and-talks "with the intent and purpose of arresting the occupant does not fall within the scope of the implied license," unlike an officer knocking on the door to ask questions of the occupants. 1-ER-17.

The district court misapplied *Lundin*. Fourth Amendment inquiries require a totality-of-the-circumstances approach, in which a court balances various factors in determining the reasonableness of the challenged officer's actions. *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 234 (1983); *United States v. Carloss*, 818 F.3d 988, 994 (10th Cir. 2016) (rejecting any bright-line rules regarding the implied license and knock-and-talks); *cf. King*, 563 U.S. at 459 ("the ultimate touchstone of the Fourth Amendment is reasonableness")

41

(internal citations omitted). While the *Lundin* panel did state that the "knock and talk exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant," 817 F.3d at 1159-60, *Lundin* did not purport to create a categorical, bright-line rule that overrules the required Fourth Amendment analysis. By reading *Lundin* to assert a bright-line rule that no officer can *ever* enter a curtilage with intent to arrest the occupant, and applying it to find that ICE's policies violated the Fourth Amendment, the district court misread the case and interpreted it in a way that provides unsupportable results. *See* 1-ER-14-18; *see also United States v. Esqueda*, 88 F.4th 818, 826-27 (9th Cir. 2023) (holding that officers did not exceed the scope of the implied license and noting that *Jardines* was "primarily concerned with the scope of an implicitly licensed physical intrusion"). Further, *Jardines* did not disavow Supreme Court precedent that when a person stands in the doorway of a home, they can be subject to an arrest without a warrant permitting entry of the home, as it constitutes a public place. *See, e.g.*, *McArthur*, 531 U.S. at 335 (2001); *Santana*, 427 U.S. at 42.

The district court therefore erred in applying *Lundin* to outright bar ICE's policies and practices regarding knock-and-talks as violating the Fourth Amendment. Further, while the district court acknowledged that

42

"the specific facts surrounding each knock-and-talk can vary," 1-ER-17, its holding does not allow for any flexibility and instead held that ICE's knock-and-talks categorically violate the Fourth Amendment. The court's conclusion directly impedes not only ICE's ability to conduct a knock-and-talk, but also prevents any court, both judicial or administrative, from evaluating the reasonableness of ICE's conduct of a possible knock-and-talk on a case-by-case and totality-of-the-circumstances approach. *See Jardines*, 569 U.S. at 10 (noting that courts must employ an objectively reasonable inquiry for the scope of whether an officer exceeded the scope of an implied license).

Moreover, *Lundin* itself demonstrates that Fourth Amendment inquiries cannot be confined to a bright-line rule and instead must be evaluated under the totality-of-the-circumstances approach. For instance, *Lundin* placed considerable weight on the fact that the police there knocked on the suspect's door at 4:00 a.m., rather than at a reasonable hour. 817 F.3d at 1160; *see also Young v. Borders*, 850 F.3d 1274, 1298 (11th Cir. 2017) (dissent) (discussing *Lundin* and its holding that the timing of the knock exceeded the scope of the implied license to approach based on being outside of normal waking hours). By contrast, ICE knock-and-talks are permitted only between the hours of 6:00 a.m. and 9:00 p.m., and serve as evidence of

43

ICE officers attempting to comply with the implied license available to every person who may approach an individual's home. *See* 2-ER-249, No. 16. The district court judge's outright rejection of this distinction as "not materially distinguishable" from *Lundin* is unsupported and fails to consider that reasonableness inquiries must occur on a case-by-case basis. 1-ER-16. The district court also clearly applied a bright-line rule by failing to address the specifics of any of Plaintiffs' provided narratives relating to alleged knock-and-talks in analyzing the constitutionality of these practices.[8] *See* 1-ER-17.

Ultimately, this Court should reverse the district court's holding that ICE's knock-and-talk policies and practices violate the Fourth Amendment, as it misinterpreted *Lundin* to establish a bright-line rule.

### B. Civil Immigration Enforcement Requires Distinct Analysis Under the Fourth Amendment

Importantly, this Court can reverse the district court's Fourth Amendment holding based on the court's flawed analysis relating to *Lundin* alone, without reaching the viability of ICE's use of administrative warrants. However, the Court may also find the district court's holding erroneous, as it failed to analyze the reasonableness of ICE's practices in the civil

---

[8] Almost all of Plaintiffs' narratives submitted as uncontroverted facts were in fact contested by Defendants and serve as evidence of ICE's use of ruses, rather than knock-and-talks. *See* 1-ER-6 n.8; 2-ER-208-15, No. 69-81.

44

immigration context, which is distinct from the criminal context. *See* 1-ER-10-14. Courts have consistently recognized that immigration proceedings are civil rather than criminal in nature, and that their implementation therefore falls primarily within the purview of the legislative and executive— not the judicial—branches. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Carlson v. Landon*, 342 U.S. 524, 537 (1952); *Tun-Cos v. Perrotte*, 922 F.3d 514, 524 (4th Cir. 2022).

The district court erred by holding that ICE knock-and-talk policies were unconstitutional regardless of the existence of administrative arrest warrants supported by probable cause when such enforcement actions are initiated. *See* 1-ER-11-12. In doing so, the court relied on a stipulation by the parties to limit the scope of discovery which stated that Defendants would "not argue or claim that an administrative warrant (I-200) or warrant of removal (I-205) provides the Government the legal authority to enter a residence or other location in which an individual has a reasonable expectation of privacy under the Fourth Amendment" and that they would not argue "that the presence of such warrant is a factor supporting any defense by Defendants in this action, in the District Court or on appeal." 1-ER-11-12; 3-ER-363, Stip. 22. However, in Defendants' motion for summary judgment, Defendants argued that Plaintiffs could not meet their burden of

45

proof for their summary judgment motion based on ICE's use of administrative warrants, rather than as a defense. *See* 1-ER-12. The district court rejected Defendants' attempt to rely on administrative warrants based on the stipulation, but nonetheless proceeded to analyze the use of administrative warrants. *See* 1-ER-12-14. Because this stipulation ultimately formed the basis for the court's ruling on a legal question and the court addressed it alternatively, this Court can consider the effect of the existence of administrative arrest warrants despite the stipulation if it so choses. *See Martin* v. *Sundial Marine Tug & Barge Works, Inc.*, 12 F.4th 915, 919 (9th Cir. 2021) (declining to enforce a party's stipulation on "a legal question").

Unlike the police in *Lundin*, ICE officers do in fact have arrest warrants when they perform knock-and-talks. *See* 2-ER-251, No. 28 ("Field Officers in the Los Angeles Field Office are required to have a Form I-200 Warrant of Arrest or a Form I-205 Warrant of Removal when conducting a targeted enforcement action."). Notably, warrants issued under the authority of the INA are civil warrants, as opposed to criminal warrants. *See generally* 8 U.S.C. § 1226(a) (suspected illegal aliens may be arrested, and detained pending removal from the United States, "[o]n a warrant issued by the [Secretary]" rather than by an independent judicial officer). The court below

46

erred when it rejected Defendants' attempted distinction of *Lundin* based on the use of administrative warrants. 1-ER-16. In doing so, the district court once again misread *Lundin* to establish a "clear proposition that 'the knock and talk exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant.'" *Id.* (citing *Lundin*, 817 F.3d at 1160).

In fact, a panel of this Court, in an unpublished decision, distinguished *Lundin's* holding based on the Executive's use of administrative warrants in the removal context. *Matias Rauda* v. *Wilkinson*, 844 Fed. Appx. 945, 948 (9th Cir. 2021) (per curiam). The panel, which included Judge Bea, who was also on the *Lundin* panel, specifically declined to extend *Lundin* to the removal context, as the "immigration warrant licensed the officers to solicit consent to entry for the limited purpose of enforcing the civil immigration laws, a context that implicates distinct constitutional interests from those involved in a criminal case." 844 Fed. Appx. at 948 (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984)). The district court here, however, distinguished *Matias Rauda* simply because it arose in the context of suppression in removal proceedings, 1-ER-15-16, ignoring the apt and correct *Matias Rauda* reasoning regarding the application of *Lundin* to the civil immigration context.

47

Substantively, the court below also wrongly discounted the Supreme Court's decision in *Abel v. United States* as having "expressly declined to consider whether an administrative warrant" satisfies the Fourth Amendment. 1 - ER-13. *Abel*, however, expressed strong approval for administrative warrants, when the Supreme Court affirmed a conviction for conspiracy to commit espionage based on evidence seized by immigration officers following the execution of an administrative warrant at the hotel room where the petitioner was living. 362 U.S. at 221-22. Although the Supreme Court did note that the petitioner had waived any argument that the administrative warrant used by the INS agents did not satisfy Fourth Amendment standards, *id.* at 230, it nevertheless discussed the Executive Branch's statutory authority to arrest aliens under an administrative warrant, while underscoring that the "constitutional validity of this longstanding administrative arrest procedure in deportation cases" has never meaningfully been challenged. *Id.* at 233. And given that the record was devoid of any evidence that the administrative warrant was used as an unlawful instrument of criminal law enforcement, the Court concluded that the arrest procedure applied to the petitioner by the INS agents was lawful. *Id.* at 230; *see also United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996)

48

(recognizing the Court should "treat Supreme Court dicta with due deference").

This Court, citing the Supreme Court in *Abel*, has acknowledged the viability of administrative warrants and the important distinction between criminal law enforcement and civil immigration enforcement. *See Gonzalez v. ICE*, 975 F.3d 788, 825 (9th Cir. 2020) (noting "*Abel*'s recognition that Congress may delegate certain decisions to executive officials in the immigration context without violating the Fourth Amendment"); *Sherman v. United States Parole Comm'n*, 502 F.3d 869 (9th Cir. 2007) (applying *Abel* in upholding administrative parole warrants); *see also City of El Cenizo* v. *Texas*, 890 F.3d 164, 187 (5th Cir. 2018) (citing *Abel* and noting "that federal immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability").

Moreover, *Abel*'s implicit sanction of knock-and-talk practices in the civil immigration context is consistent with *Matias Rauda*, where the panel held that "the ICE officers were privileged to approach the residence to execute an immigration warrant that authorized Matias Rauda's arrest in public areas or in private areas with the consent of a co-occupant." 844 Fed. App'x at 948. ICE officers are licensed to approach a residence "to solicit consent to entry for the limited purpose of enforcing the civil immigration

49

laws, a context that implicates distinct constitutional interests from those involved in a criminal case." *Id.* at 948; *see also Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983) (vacating injunction that prohibited INS officials from "approaching homes for the purpose of questioning persons therein" because it "precludes practices that facilitate the enforcement of immigration laws"). Thus, if this Court were to reach ICE's use of administrative warrants, it should hold that the district court's finding that ICE's knock-and-talk practices categorically violate the Fourth Amendment is inconsistent with these principles and reverse.

### III. The District Court's APA Ruling Is Incorrect, as the Court Erred by Interpreting the Regulation in Isolation

Even assuming ICE's knock-and-talk policies constituted final agency action, the court erred in finding the policies to be inconsistent with 8 C.F.R. § 287.8(f)(2) and unconstitutional. 1-ER-18-21. The regulations at 8 C.F.R. § 287.8(f) regulating "Site inspections" holds that an ICE officer "may not enter into the non-public areas of . . . a residence including the curtilage of such residence," if the purpose is to question the occupants "concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected." 8 C.F.R. § 287.8(f)(2). The court below held that the regulation's use of the term "warrant" referred to a judicial warrant rather

50

than an administrative warrant, and as such ICE's knock-and-talk policy of entering the curtilage to question the occupants violated the regulation. 1-ER-20-21.

This holding is wrong. The court premised this finding on an isolated view of the specific regulation cited, rather than considering other parts of the regulations and the INA itself which authorize immigration officials to issue both search and arrest warrants. *See*, *e.g.*, 8 C.F.R. § 287.5(e) ("Power and authority to execute warrants"); 8 U.S.C. § 1226(a); *cf. United Sav. Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1998). Congress specifically referred the term "warrant" in the INA as "a warrant issued by the Attorney General." *See* 8 U.S.C. § 1226(a). In the corresponding regulations, the agency uses the terms "warrant of arrest" and "warrant" interchangeably. *See* 8 C.F.R. § 236.1(b)(2) ("[I]f after the issuance of a warrant of arrest . . . such warrant"). Similarly, in 8 C.F.R. § 287.8, the terms "warrant of arrest" and "warrant" are used interchangeably. *See* 8 C.F.R. § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officers has reason to believe that the person is likely to escape before a warrant can be obtained"); 8 C.F.R. § 287.8(c)(2)(iv) ("the arresting officer shall adhere to the procedures set forth in 8 C.F.R. § 287.3 if the arrest is made without a warrant"). If the agency had intended to limit

"warrant" in 8 C.F.R. § 287.8 to a "judicial warrant," it could have done so—it did something similar, for example, in 8 C.F.R. § 287.9, which references "criminal search warrants."

Further, the court's reliance on *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019), for the proposition that § 287.8 requires a judicial warrant is misguided. 1-ER-20-21. *Perez Cruz* dealt with whether immigration officials who were executing a federal magistrate's criminal *search* and *arrest* warrants, rather than an administrative arrest warrant had reasonable suspicion to detain the plaintiff as set forth in 8 C.F.R. § 287.8(b)(2), and as applied in the warrant exception set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Perez Cruz*, 926 F.3d at 1134, 1137-38. The Court did not answer the question whether an administrative warrant constituted a "warrant" under § 287.8(f)(2). *See* 926 F.3d at 1138. Moreover, Plaintiffs' interpretation of "warrant" in § 287.8(f)(2) below to mean only a "judicial warrant" is inconsistent with *Matias Rauda*, 844 Fed. Appx. at 948, which acknowledged 8 C.F.R. § 287.8(f)(2) in finding that ICE officers did not act unlawfully by knocking on the front door of the residence for the purpose of effectuating an administrative arrest without a judicial warrant. Thus, because the court read § 287.8(f)(2)'s use of the term "warrant" in isolation and to mean "judicial warrant," it erred in holding that Defendants' knock-

and-talk policies constituted an APA regulatory and constitutional violation, and this Court should reverse.[9]

**CONCLUSION**

The Court should reverse the district court's order granting summary judgment for Plaintiffs.

Respectfully submitted,

| | |
|---|---|
| BRETT A. SHUMATE | ANDREW C. MACLACHLAN |
| Assistant Attorney General | Senior Litigation Counsel |
| Civil Division | |
| | /s/ Stephanie L. Groff |
| YAAKOV M. ROTH | STEPHANIE L. GROFF |
| Principal Deputy Assistant Attorney | Trial Attorney |
| General | Office of Immigration Litigation |
| | Civil Division |
| DREW C. ENSIGN | P.O. Box 878, Ben Franklin Station |
| Deputy Assistant Attorney General | U.S. Department of Justice |
| Office of Immigration Litigation | Washington, DC 20044 |
| | Tel: (202) 305-5438 |

*Attorneys for Defendants-Appellants*

BRIAN DONOHUE
Law Clerk

---

[9] The district court discounted Defendants' reading of § 287.8(f)(2) to include administrative warrants because "[f]or Defendants' interpretation to hold water, an administrative warrant would authorize officers to enter a residence, which, as discussed previously, is an untenable position." 1-ER-21. Even if the regulation could be read in that manner, there is no dispute that entries into the home without consent are not at issue in this case. The administrative warrants here effect ICE's knock-and-talk policies and officers entering the curtilage, and Plaintiffs have not alleged in this case that ICE is using this regulatory authority to enter an alien's dwelling, absent consent. *See* 2-ER-250, No. 25; *see, e.g.*, 2-ER-148-76.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,379 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in proportionally-spaced 14-point Georgia type.

/s/ Stephanie L. Groff
STEPHANIE L. GROFF
Trial Attorney
Dated:  February 19, 2026                Office of Immigration Litigation

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on February 19, 2026.

I further certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.


/s/Stephanie L. Groff
STEPHANIE L. GROFF
Trial Attorney
Office of Immigration Litigation

2